## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jan 15 2020, 10:04 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael R. Fisher
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Benjamin J. Shoptaw
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Tyrone Williams,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

January 15, 2020

Court of Appeals Case No.
19A-CR-2047

Appeal from the Marion Superior Court

The Honorable Grant Hawkins, Judge

Trial Court Cause No.
49G05-1706-F3-22918

**Brown, Judge.**

[1] Tyrone Williams appeals his sentence for three counts of rape as level 3 felonies and asserts his sentence is inappropriate. We affirm.

## *Facts and Procedural History*

[2] On June 13, 2017, K.H., who had just graduated from high school, woke up, let her dog out, brought her dog back in, and then went back outside again and the door locked behind her. K.H. did not have her phone with her, remembered seeing someone sitting in the driveway at a house across the street, and knocked on the door of that house. Williams, who was born in 1976, answered the door, and K.H. asked if she could borrow a phone. He said that she could but that it had a cord and she needed to come inside.

[3] K.H. entered the house, and Williams gave her a phone without a cord. K.H.'s mind went blank, and she could not remember any of her family's phone numbers. She told Williams who was standing behind her that she could not remember anybody's numbers and heard the door close and lock. She then felt something sharp and cold against her back, and Williams said it was a knife. Williams told her to go down the hallway to a bedroom, and K.H. complied.

[4] Williams then told her to remove her clothes, and she told him no. He became angry and yelled at her to remove her clothes, and she did so. He then told her to lay on her stomach on the bed, and she told him no and that she just wanted to go home. He told her again to get on the bed, and she could still feel the knife on her back. She got on the bed, and he climbed on top of her. He told her to face the television which was playing pornography and told her to watch.

He told her to spread her legs, and she complied while still feeling the knife on her back. His knees were on the backs of her legs which caused her pain. He inserted his penis into her vagina, and she cried, told him no multiple times, and told him to stop.

Williams told K.H. to perform oral sex on him, and she told him no and continued to cry. He became loud and aggressive and still had the knife. He removed a picture from a shelf, told K.H. it was a picture of his daughter, and told her that he wanted her to look at it while she put her mouth on his penis, and K.H. complied.

At some point, Williams entered the living room and told her to do so as well. He sat on the couch and told her to get on her knees in front of him and continue oral sex. K.H. told him no and that she just wanted to go home and continued crying. He repeated himself, and she complied. She vomited on his lap and the couch, and he laughed and used his penis to rub the vomit on her face. He then placed his penis in her vagina.

At some point, Williams made K.H. enter the kitchen where he made grilled cheese sandwiches. He made K.H. return to the living room and told her to eat. After he ate, he made K.H. perform oral sex and inserted his penis into her vagina. When he inserted his finger in her anus, K.H. told him "no, that it hurt," and he said, "but you'll like it." Transcript Volume II at 38. Williams then tried to insert his penis into her anus. Williams had the knife the entire time. He told K.H. to dress, and she put on her pants and shirt but forgot her

bra and underwear. He handed her his phone number and opened the door, and K.H. left.

[8] K.H. went home and tried a sliding glass door to her mother's room which they did not usually use, realized it was unlocked, entered her home, and called the police. Lawrence Police Sergeant Gabriel Slaybaugh responded to the call and found K.H. was "kind of, hysterical, crying, scared." *Id.* at 65. She was transported by ambulance to the hospital where she underwent a sexual assault examination. Nakia Bowens, a sexual assault nurse examiner, examined K.H. and determined that she had redness at her scalp line, a bruise on her left arm, injuries to the backs and sides of her legs, redness on her knees, petechiae and redness in her mouth and back of her throat, and genital and anal injuries.

[9] On June 20, 2017, the State charged Williams with three counts of rape as level 3 felonies. On October 2, 2017, Williams's counsel filed a motion for appointment of medical experts to report on Williams's competence to stand trial and sanity at the time of the offense. On October 3, 2017, the court appointed Drs. Don Olive and George Parker to examine Williams. On November 9, 2017, Dr. Olive filed a report indicating that Williams denied any history of mental disease, defect, or treatment. He concluded that Williams possessed sufficient present ability to consult with his attorney and was competent to stand trial. He also concluded that, with regard to Williams's mental state at the time of the offense he saw no evidence of mental disease or defect that militated against his capacity to appreciate the wrongfulness of his conduct. In December 2017, Dr. Parker submitted a report indicating that

Williams likely met criteria for a diagnosis of schizophrenia and concluding that he was capable of understanding the legal proceedings against him, capable of assisting counsel, and "did not have a mental disease, as defined in Indiana statute, and did appreciate the wrongfulness of his actions, at the time of the alleged offenses." Appellant's Appendix Volume II at 76.

[10] On May 9, 2018, the court entered an order appointing Dr. Olive to examine Williams. On June 12, 2018, Dr. Olive filed a report indicating that he attempted to re-evaluate Williams at the jail and chose to terminate the interview after Williams became highly agitated and hostile. He stated that a review of the jail record indicated that Williams had his most recent antipsychotic injection on August 31, 2017, and had consistently refused his antipsychotic injection based upon his ongoing denial of his schizophrenia. He concluded that Williams was incompetent to consult with his attorney. On July 27, 2018, the court entered a Commitment Order to the Indiana Department of Health which found that Williams did not have sufficient mental comprehension to aid his attorney in his defense and that he should undergo evaluation and treatment. In a letter dated December 28, 2018, Interim Superintendent Greg Grosteron informed the trial court that a report filed by Dr. Douglas Morris indicated that Williams had attained the ability to understand the proceedings and assist in the preparation of his defense.

[11] On July 25, 2019, the court held a bench trial. The State presented the testimony of K.H., Sergeant Slaybaugh, and Nurse Bowens. After the State rested, Williams testified that he was forty-two years old, unemployed, lived

with his mother, and supported himself with social security. He stated that he let K.H. in to use the phone, he closed the door but did not lock it, they sat on the couch, he asked her if she wanted to have sex, and she said no. He testified that he asked K.H. if she wanted to go to his room and she went with him and sat on his bed. He testified that K.H. went home and then returned fifteen minutes later and told him she wanted him to "put some bruises on her." Transcript Volume II at 119. He stated: "And I said that I don't do nothing like – she said her mother does it – does it any old way. And I said I don't do nothing like that, but we was going to have – I guess she wanted to have sex; so that was cool with me." *Id.* He indicated that they engaged in consensual sex and denied pulling a knife. He testified that K.H. made herself throw up in the living room. He stated that he spoke with the police when they arrived and gave them his clothing and some knives. On cross-examination, he indicated that she threw up on him and, when asked if he "made her keep going," he answered: "I just didn't care. I didn't care." *Id.* at 127. The court found Williams guilty as charged.

[12] On August 1, 2019, Williams's defense filed a sentencing memorandum asserting that Williams had been diagnosed with schizophrenia, schizoaffective disorder, and substance abuse disorders.[1] It also alleged that Williams was severely mentally ill at the time of the offense, that the crime was the result of

---

[1] The sentencing memorandum was submitted by "Aftan Archer-Cox MSW, LCSW" and "Brandon Hartsock, MSW Intern" of the Marion County Public Defender Agency. Appellant's Appendix Volume II at 122.

circumstances unlikely to recur, and that he would likely respond affirmatively to short-term imprisonment. At the sentencing hearing, neither party presented testimony. Williams stated: "I'd just like to say that I'm innocent and that you give me the best possible sentence and the lenient sentence, for someone." *Id.* at 142. The prosecutor asked for consecutive sentences of nine years on each count for an aggregate sentence of twenty-seven years. Williams's counsel asked for an advisory sentence of nine years with credit for time served and the remainder to be served on community corrections and home detention and then suspended time with probation. He asserted: "We believe that continued mental health treatment, compliance with medication, and any counseling that the court believes is appropriate . . . ." *Id.* at 148-149. The presentence investigation report ("PSI") stated that Williams rated his mental health as excellent, but it also observed that he stated he was diagnosed with schizophrenia at the age of eighteen and was receiving medication at the time of his arrest.

[13] The court found "the statement that he had a knife, which made the victim more compliant, the victim's young age and the injuries she suffered," as aggravating factors. *Id.* at 149. The court found the fact that he had no recent criminal history and his mental illness as mitigating factors but stated that "[t]he fact that he denies the mental illness and sometimes refused treatment for it kind of cut into the mental illness." *Id.* The court sentenced him to concurrent terms of fifteen years on each count with nine years executed in the Department of Correction and six years in community corrections.

## *Discussion*

[14] Williams states that no words can depreciate the gravity of this offense or the physical and emotional suffering endured by the victim, but asserts that it was less than the worst of the worst. He argues his sentence is inappropriate based upon his long history of mental illness and his bizarre behavior during the commission of the offense, which was indicative of his illness. The State argues that Williams's sentence is not inappropriate. It asserts that he took advantage of K.H. in her time of need, raped her multiple times, held her against her will for hours, has a criminal history, and failed to acknowledge any mental illness in the court proceedings.

[15] Ind. Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). Ind. Code § 35-50-2-5 provides that a person who commits a level 3 felony shall be imprisoned for a fixed term of between three and sixteen years with the advisory sentence being nine years.

[16] Our review of the nature of the offense reveals that K.H. thought she had been locked out of her residence and went to Williams's home to use the phone, and Williams told her she needed to go inside because his phone had a cord. After K.H. entered Williams's home and realized the phone did not have a cord, Williams locked the door, held something sharp and cold against her back, told

her it was a knife, and inserted his penis into her vagina multiple times despite K.H. crying and repeatedly requesting that he stop. He also forced her to engage in oral sex multiple times and inserted his finger into her anus.

[17] Our review of the character of the offender reveals that Williams had juvenile adjudications for theft as a class D felony and robbery as a class C felony if committed by an adult. As an adult, Williams has convictions for criminal recklessness as a class D felony in 1996 and criminal trespass as a class A misdemeanor in 1995. The PSI indicates that Williams's probation was revoked in 1997.

[18] The PSI indicates that Williams dropped out of high school due to "getting tired of school," was never enrolled in special education classes, and was an "above average" student prior to leaving. Appellant's Appendix Volume II at 111. It indicates that he was unemployed, had never held formal employment, and was supported by his mother and social security benefits. Under the heading "Mental Health," it states:

> Tyrone Williams rated his mental health as excellent. However, he stated he was diagnosed with Schizophrenia at the age of 18. When asked the reason for the diagnosis, the defendant related the "Adult Courts" had him evaluated in October of 1997 after he got into a fight with his mother. He reported he was sent to Logansport State Hospital where doctors eventually placed him on Zyprexa. Mr. Williams advised he was later released, but continued to take the medication daily until his 30s.

> Mr. Williams reported that following his release from Logansport, he continued with treatment through Aspire. He related doctors at the agency took him off the Zyprexa in his 30s

and replaced it with shots of Haldol every five weeks. The defendant informed he was still receiving the medication at the time of his arrest for the instant offense.

Finally, the defendant reported he was recently diagnosed with having Bi-Polar Disorder while at the Marion County Jail. He stated the doctor placed him on "Avega" ("Lithium"), which he takes on a daily basis.

Regarding his mental health, Mr. Williams related he did not feel that he suffered from Schizophrenia or Bi-Polar Disorder. He denied suffering from hallucinations or delusions and reported having no homicidal and/or suicidal ideations. Mr. Williams added there is no family history of mental illness and indicated he has never participated in anger control, domestic violence or parenting classes.

*Id.* at 112. The PSI indicates that Williams reported he first smoked marijuana at the age of fifteen, it became a daily habit by the age of sixteen that included two to three "blunts a day," he last smoked marijuana two to three years earlier, and it was never a problem. *Id.* The PSI also states that his overall risk assessment score using the Indiana risk assessment system places him in the moderate risk category to reoffend.

[19] After due consideration, we conclude that Williams has not sustained his burden of establishing that his sentence is inappropriate.

[20] For the foregoing reasons, we affirm.

[21] Affirmed.

Baker, J., and Riley, J., concur.